Good morning. May it please the court. My name is Christopher Copaz and I represent the defendant, Ronald Patterson. I'll take about 15 minutes and then reserve maybe three minutes or so for rebuttal, if that's okay. Counsel, I ask you to get to your key points first. However, there is one key point that I'm concerned with, the motion to suppress. I clearly want you to deal with that. Okay. I plan to. We raised four issues in the brief. Today I'd like to concentrate my arguments on the first two issues, the confession. Could you keep your voice up, please? Oh, sure. Thank you. I would like to concentrate my arguments on the confession and the rape shield violation. Okay. And if I may, I'd like to begin with the rape shield issue, actually, very briefly, and that's argument two in the brief. At Ronald's jury trial, the state elicited testimony from the examining physician that Emily had an area of redness on her cervix and that this injury was consistent with sexual intercourse. The state also presented evidence that a vaginal swab was taken during the exam and that Ronald's DNA was not found in the sample. Now, Ronald sought to confront this physical evidence by presenting evidence to the jury that DNA was present or was found in the vagina. And, in fact, this DNA came from Emily's boyfriend, with whom she had had intercourse three days earlier. This evidence would have showed a possible alternative source for the injury to Emily's cervix, and that it came about from someone other than Ronald. The trial court, however, excluded this evidence, reasoning that it would violate the rape shield statute, but this reasoning was wrong and it deprived Ronald of a fair trial. Under the constitutional exception to the rape shield statute, evidence of a victim's prior sexual history may be admissible when that history explains some physical evidence, such as physical indications of sexual intercourse, and that is precisely what we have here. We have an injury to the cervix, which a physician says indicates sexual intercourse, and Ronald was prohibited from confronting that physical evidence with evidence that it could have come from another person. And that would have demonstrated that, or would have supported Ronald's testimony that he did not have vaginal intercourse with Emily. And the state argues that this wasn't relevant, but it certainly was relevant because the state deliberately elicited this evidence, and then during closing argument used this evidence of the injury to prove that there was vaginal penetration here. And if this court has no other questions, then I'll move on to the confession. The trial court is supposed to use an abuse of discretion standard of review when considering the evidence that's been excluded. It's your position that the trial court abused its discretion when it admitted this evidence, or excluded this evidence? Certainly. It had a constitutional right to confront the evidence against him, and it appears that the court in ruling made sort of a misreading of the statute and saying that, or the rule, and saying that this evidence wasn't admissible. It's your contention that this evidence was relevant to an important aspect of the case? Yes, certainly. The physical injury was the only, to the cervix, was the only physical evidence that suggested that there was vaginal intercourse. And that was sort of the, you know, dispute between Emily and Ronald's testimony. Ronald testified that there was just some consensual oral sex. Emily testified that there was oral sex along with vaginal penetration. And so the state used this physical injury to corroborate Emily's testimony. And Ronald was deprived of the ability to confront that evidence. And this evidence would have corroborated the defendant's testimony, in your opinion? Yes. Because, again, Ronald testified that there was no vaginal intercourse during that time. There was only consensual oral sex. So it would have supported his testimony. And, again, you know, the jury was out for nine hours deliberating on this case. The jury obviously thought this was a closely balanced case and one that, aside from this injury, came down to a credibility contest between Emily's testimony and Ronald's testimony. And so with Ronald's ability to confront this physical injury, it definitely supports his testimony and makes this an even closer case, and that's why it's necessary to reverse. Okay. As for the confession, we raised sort of two sub-arguments challenging that. The first argument is that, based on the evidence presented at the motion to suppress hearing, the confession was not voluntary. When reviewing the voluntariness of a juvenile's confession, extra scrutiny is required. And there's an additional, very significant factor that the courts must look at, and that's the presence or the absence of a parent or an adult who's concerned for the juvenile's welfare. Here, Ronald was deprived of that concerned adult during the police interrogation. Was there a police officer present acting as a youth officer? There was a youth officer. Our position is that he did not act as a concerned adult and certainly did not make a reasonable attempt to contact a concerned adult on Ronald's behalf. Why is it the officer was not a concerned adult? Two reasons. One is that he was an active participant in the investigation. You know, he was interviewing witnesses at the Costigan Center. He was interviewing, you know, he was in the interview room with Ronald and the interviewing detective. He helped prepare the statement in terms of typing it up and reading it up and reading it back to Ronald. So he was an active participant in the investigation against Ronald. And so in no way could he be even, you know, neutral in this case. And also, you know, he didn't advise Ronald that he could be charged as an adult, something that the trial court recognized, something that you would expect a youth officer to do. Do you know whether he actually was a youth officer? Because sometimes police officers are in the youth division and they are specifically youth officers as opposed to just an officer. So was he a youth officer? According to his testimony, he was. He had received the necessary training to be an actual youth officer, as we use the term. So I don't dispute that he was actually a youth officer in that regard. What we dispute is whether he could, you know, offset the absence of someone who is concerned for Ronald's welfare in this case. In your position, the youth officer had a conflict. He's investigating the case and he's supposed to be assisting the defendant at the same time who was a juvenile. Yes. Or at least, you know, if not, you know, actively assist Ronald, you know, find someone who could confer with Ronald before the interrogation began. Kaminsky's actions here, you know, were a rather poor attempt to do that. He contacted the director of the home where Ronald was staying at about 9.53 on a Sunday night, got a voicemail, found out from another officer that that director had given permission to speak to Ronald for what that's worth. The detective called Ronald's caseworker at 9.58 on a Sunday night and left a voicemail for her. And then at 10 o'clock p.m., the officers began questioning. So the officers made, you know, the youth officer, Kaminsky, made a rather pitiful attempt to contact someone who could confer with Ronald, someone who had his interests at heart before the questioning began. The officers could have contacted, you know, someone in Ronald's family. Even though he was a ward of the state, it's reasonable to assume that he's got family who could be contacted. He'd had a foster father and a foster mother who he'd visited just the day before. Or, as Stephen Kehoe testified, you can call the DCFS hotline, 24-hour hotline after hours. Even if it's an abuse hotline, presumably someone from DCFS can answer the phone and help guide the officer to someone who can come and confer with Ronald before the interrogation began. And so at a minimum, you know, even if the officer didn't do anything to affirmatively protect Ronald's rights, the officer at a minimum should attempt to find someone, and Kaminsky failed to do that here. And that's an important factor in the voluntariness analysis. Because as we know, juveniles are susceptible to police coercion, and it's important to have someone there to confer with them. Is it undisputed that after the attempt to contact String Ward and the caseworker, that within five minutes of those phone calls, they started the interrogations? Is that undisputed? Yes, that is undisputed. Did they try to contact the parents at all? They did not. And so those facts are undisputed. And so the officers rushed to interrogate Ronald. And in fact, within an hour and 15 minutes or so, the officers had a signed typewritten confession ready to go from this 15-year-old juvenile who had been arrested earlier that day. What was Ronald's IQ? His IQ was 72. And how did that fit into a range? What does 72 mean? So 72, by statute, 70 is presumptively mentally retarded. So Ronald is at the borderline of presumptive mental retardation. And that brings us to sort of the second prong of our argument, is that trial counsel should have presented more of this evidence of Ronald's mental impairments at the motion to suppress. Because just like juveniles, people who are mentally retarded are susceptible to police coercion. People with mental retardation have diminished understanding, comprehension, thinking, reasoning skills that make them want to please the person who is questioning them or bow to the wishes of authority figures. And so it was important for trial counsel to get that information out to the trial court during the motion hearing. Ronald had an IQ of 72, as you said. The reading level that Ronald was reading at was the second or third grade reading level. So obviously his ability to sort of read and comprehend the written statement was limited. Ronald had been treated for a number of psychiatric illnesses like bipolar disorder, ADHD, depression. Ronald was a child who was born with cocaine in his system. So he was someone who, throughout the course of his life, had a number of psychiatric disorders. And in fact, in the statement itself, Ronald tells the officers that he hadn't been taking his medication for bipolar disorder. So trial counsel should have presented this evidence to the trial court that would have further supported the case that this confession was involuntarily taken. So Mr. Patterson was a young man. He had limited intelligence and limited education. Yes. So he's really a very challenged individual. Yes, he is. So when we consider all these things, you maintain that it impacts on the voluntariness of this confession. Yes. And it also goes to address, I think, sort of two important things that went on here. One is that Ronald, as I said, gave a confession and had it typewritten and signed within an hour and 15 minutes. So that's probably an unusually fast time for police to have that confession. And so the fact that Ronald is apparently mentally retarded and has these mental impairments sort of explains the swiftness of his confession, in that he wants to please the people who are questioning him but he doesn't realize the consequences of his confession. And it also goes to address the trial court's finding that Ronald was, quote, a very astute young man. If you look at the literature cited in our brief, it's undisputed that people with mental retardation often become very good at masking their impairments. And that's likely what happened here, that Ronald, as he's testifying, is successfully masking whatever mental impairments he has and leading the trial court to incorrectly conclude that Ronald is an astute young man when really he's a kid with an IQ of 72 and a long history of psychiatric disorders. So you're alleging that the trial court erred when denied the motion to suppress the written statement. Yes. If that were the case, could this have been harmless error? We maintain that it's not harmless error. Why? The admission of a confession is generally not harmless error because it's a very powerful piece of evidence before the jury. And if you, as I said, take away the confession, you're left with a very pure credibility contest where Ronald testifies at trial, renounces that confession, says that he signed whatever was given to him, versus Emily's testimony, which was impeached in some ways. And so the jury is really just balancing these two testimonies. And the jury had a problem, or at least thought the case was closely balanced enough to deliberate for nine hours over two days about this case. It's a relatively simple one involving two versions of offense about the same encounter. You mentioned nine hours again. What significance is that? What if they came out 15 minutes later? Well, presumably. Presumably? We're supposed to presume? Yeah. There's case law cited in our brief that says that that's a factor that you can look to to determine sort of the closeness of the evidence. We are not able to view the witnesses as they testify. The jury did. And the fact that the jury deliberates over two days for such an extended period of time, you can presume that it means that the case was closely balanced, gave them a lot to think about and discuss during their deliberations. And again, the prosecutor relied on this confession in his closing statement, told the jury to go back and look at this statement as evidence of what happened. So it is something that the prosecutor used in support of his argument. And if this court has no further questions, I'll reserve some time for rebuttal. You're going to stand on the brief with respect to the third issue? That's fine. You don't have to address it. The excessive sentence issue? Or the juvenile transfer issue? The juvenile transfer issue. We would stand on the brief unless this court has questions. It's been ruled on in a number of cases. So we would just stand on our brief. Very good. Thank you very much, counsel. Thank you. Morning, counsel. Morning. Again, your honors. Again, for the record, Assistant State's Attorney Douglas Harbath on behalf of the people. I'll treat the issue sort of in reverse order because what counsel was just talking about regarding the motion to suppress the defendant's inculpatory statement, his confession. The trial court properly denied the motion to suppress. And I want to point out that there's no evidence and there's no claim on appeal that there's evidence in the record of threats or coercion or compulsion of any sort. That issue is not even raised. And that's because the arrest was valid. His detention was brief. He was questioned for 45 minutes. He was in custody for a total of 90 minutes before the questioning even started. Do you agree that his parents, if at all possible, should have been notified? There's a lot of possibilities. They weren't notified. You're conceding they weren't notified. That his parents were not notified? The record does not reflect that his parents, yes. Now, he's a ward of the state, right? That's correct. You agree with that? So they went and they notified SBHS, attempted to, two people there they left messages for. But they never notified DCFS? Well, they did notify DCFS. The detective left a message for his caseworker. It was a Sunday night at 10 o'clock. That's the institution where he was. But DCFS has a hotline, don't they? They do. We used to call it. Right. So if they have a hotline, why weren't they notified? If he's a ward of the court, whose responsibility is to watch him? Well, ultimately it's Mr. Kehoe. No, no, no. We can't get a hold of him. Who's ultimately responsible? Who asked him to become a ward of the state? That's not in the record, Your Honor. He was actually, it was a no-fault dependency situation where his parents couldn't control him, so they ceded custody to DCFS. So DCFS, as an institution, no attempt was made to contact them? I disagree with Your Honor. Okay, how? Because, well, first of all, he's a resident at the residential treatment facility. Mr. Kehoe is the director of it. He's a contracted entity from DCFS. But if you can't get a hold of them, DCFS is the contracted person. DCFS, we all agree, has a 24-hour hotline. They do, Your Honor. And it's reserved for them. No attempt was made to call that 24-hour hotline.  No, he did not. I'm sorry. I'm just trying to understand the fact that he, after making two calls, neither of which was DCFS, nor neither of which was the parents, after making two phone calls, two or three minutes later, they started questioning. I don't think that's a fair representation of the record, Your Honor. Mr. Kehoe was actually present when Mr. Patterson was arrested and taken to the Schomburg Police Department. He was there. And he actually gave permission. I mean, the record is there's two versions, but the trial court credited the youth officer's version of the events that Mr. Kehoe gave permission to speak with the defendant. Who is that? Mr. Kehoe. He's the director of the residential facility. And then a phone call was also made to the defendant's caseworker, Ms. Sandra Smith, who, you know, of course she wasn't at work at 830 on a Sunday night or 9 o'clock on a Sunday night. He left a message for her. There's no per se rule that these efforts have to be undertaken to contact a concerned adult, and that was undertaken in this case. The fact that a concerned adult was not actually present for the statement or physically appeared in the police station, there's no per se rule that that's required. And this situation is perhaps a little unique because the defendant is a ward of the state. So the officer saw it necessary to make phone calls to try to get someone to be with the defendant. As is consistent with his role, the youth officer, he has to do that. He got no response. Why did they have to start interrogation then? Why couldn't it have waited until the next morning? You know, and I think there's a case called Kolakowski that speaks directly to that, and it's an argument that the defendant raises in his brief. He says, well, why didn't they wait until Monday? There's no requirement. The police are not required to delay or postpone questioning of a juvenile simply because a concerned adult has not actually been contacted. But they made no attempt to reach the concerned adult as the parents. The parents did not have custody of the defendant. I think he had a meeting earlier. He became a ward of the state, so you're right. Yes, and he had a former foster father I think was the person that he was having that visit with. Whether or not the police could have called the hotline or whether or not they could have gone to his old place of residence, there are a myriad of things that the police arguably theoretically could have done, but that's not required under the law according to GO. GO says that there's no per se rule and a statement need not be suppressed simply because the defendant was denied the opportunity to confer with a concerned adult. And that's sort of the reason why a youth officer, that whole concept of a youth officer is created, and it offsets the absence of a concerned adult. So does the youth officer in that role, does he become an advocate for the defendant? He does not. He is there to attempt to make contacts with a parent or guardian or a concerned adult and to ensure that the defendant is informed of his rights, that he understands his rights, and he's not coerced. He is not an attorney at law. He's not a counselor. He's not an advocate for the defendant. There's no obligation that he endeavor to cease questioning. That specific claim has been rejected by the Illinois Appellate Court. The youth officer is not elevated to the status of attorney at law. So when the youth officer called Stringwood and didn't get a response? At the Costigan Center, I think. And I certainly appreciate what you're saying. They didn't contact the parents because he was a residential patient. His residence was Stringwood. They tried to call Stringwood. But after they called Stringwood and left a message, they didn't give Stringwood a chance to respond. I mean, two minutes later or five minutes later, they started the interrogation. I think that the record also indicates, Your Honor, that this officer, I believe her name was Paula Casey, spoke with Mr. Kehoe, who was the director, and related to the youth officer, Kaminsky, that he had given permission to speak with Mr. Patterson. So the record actually does not show that they just made sort of a poor attempt at contacting people, and then immediately went into interrogating him. They actually had permission. Should this court be concerned that we have a 15-year-old who's had limited experience with the criminal justice system, sitting in an interrogation room with a youth officer who, according to you, has no responsibilities except to be there? I'm sorry to interrupt, Judge. I disagree with that. What did he do? Much more than to just be there. What did he do? Well, he read him his rights on two occasions. He went through them. He had the defendant read them back and explain to them in his own words, which he did very well, and that he ensures that he's not being mistreated, and he was there for the entire statement. So he also interviewed the prosecutor, correct? I'm sorry? And took evidence from a woman who accused him of molesting her, correct? That the youth officer had? He participated in that investigation. He was a participant. He was not the lead detective, certainly. He was present when she was interviewed. I believe it was at the Costigan Center there. But should we be concerned where we have a 15-year-old who's got limited intelligence and limited education who's sitting in a room with a police officer and he's being interrogated? Should this court be concerned? And he doesn't have an adult there who's really concerned about what's happening. The Supreme Court has said, of course, yes, it's a sensitive concern. And what was undertaken in this case amply satisfied what the Supreme Court has said in Geo, that efforts are unsuccessful to obtain a concerned adult, a parent, a guardian, an aunt, an uncle, or a grandparent. That is not a basis to suppress a statement when there's no other evidence. And I'll repeat, there's no claim on appeal that there's any threats of coercion or compulsion of any sort. So the fact that a parent was not there, the question is whether or not the police officer, the youth officer, undertook reasonable efforts to notify the concerned adult. And you're saying two phone calls at 10 o'clock is reasonable? I'm sorry, Your Honor. Two phone calls at 10 o'clock on a Sunday night, that's reasonable? There was more than that. And they're not waiting for a response? Could they have waited? Why didn't they wait at all for a response? They had permission. I think that there was phone calls made to Mr. Kehoe and to Ms. Smith, who's the caseworker. But Mr. Kehoe, according to Officer Casey, had already told him, go ahead, it's fine that you talk to him. So they had permission. I think these were sort of beyond what they had to do. This is a situation where someone's arrested, a 15-year-old's arrested at 8.30 at night. There's simply no requirement that the police wait to conduct their investigation of an aggravated criminal sexual assault. A woman is raped every which way that they're supposed to sit there and wait to hear back whenever the caseworker gets around to returning their phone calls, which incidentally occurred two days later. And I think it's important to note the trial judge in this case noted that, well, if they had, and I think her words were, if they had sat on the defendant, if they had waited and he was stuck in the cell for 50 hours, which would have been 50 hours total by the time, by the next day, or by 50 hours. You said 50 hours? I'm sorry, I may have misspoken, that he would have been in custody for a substantial length of time before questioning. Less than 24. Well, the length of, okay, well, the longer the detention prior to the questioning, then the defense claim is that, well, they waited too long, that he's sitting in there, and that if they, and now the claim now is that they did it too quickly, even though they undertook efforts to notify people that were concerned for his welfare, and that they were unsuccessful in those attempts does not inform whether or not the statement that he gave was voluntary or not. The rule is that the youth officers, that the police, they can't prevent, they can't frustrate the efforts of a concerned adult to be present or to confer with the minor. That didn't happen in this case. It's alleged in the defense brief that they prevented that from happening. There is absolutely no evidence whatsoever they prevented anyone from conferring with the minor before they spoke with them. But you don't disagree that there's some additional steps that police could have taken? I think the answer to that is there was always, in hindsight, there was always what a shoulda coulda. There's efforts that they could have done. Well, they could have sent up smoke signals. They could have, if they called a hotline, the hotline is reserved for allegations of abuse and neglect, and I agree it's staffed 24 hours and it's for emergencies, and could a call to the hotline conceivably have put them in touch with someone? Probably. And it would have put them in touch with Sandra Smith, who they already had her phone number and they left a message for her anyway. So it would have come back to her. It would have come back to the residential treatment center where he was already being housed at. In front of the message, you're saying there's nothing that should concern this court about the voluntaryness of this profession, correct? Absolutely. There is nothing that should concern this court about the voluntary. There's no claim that his statement was, let me backtrack, there is a claim that it was involuntary. There is absolutely no claim and there's no evidence that it was threatened or the product of coercion or compulsion. And I guess this would lead into the defendant's second claim on that, that counsel was ineffective for putting this evidence, this additional evidence regarding the defendant's psychiatric or his mental history. His first claim, he didn't argue it today, but he claims that counsel didn't investigate this. The record just patently refutes that. The defense attorney in this case specifically ordered a BCI, a behavioral clinical examination, evincing his belief that there was a bona fide doubt as to his fitness. And he specifically ordered the BCX for purposes of fitness, for sanity, and for his ability to knowingly understand and waive his Miranda rights. And the examination came back. It showed he has a conduct disorder. He has no psychosis, no mood disorder. He's articulate and goal-directed. He's logical. The claim that the defendant was mentally retarded, well, the expert in this case, the examiner herself found he is not mentally retarded. So to argue on appeal that while his IQ is 72, it's sort of close to the statutory definition of mental retardation for the capital punishment statute. So someone can claim that they are mentally retarded and they can't be put to death, a statute that's currently being the product of change because we no longer have the death penalty in Illinois. That is not sort of evidence that he was mentally retarded in this case. The evidence regarding his mental retardation in this case, or lack, is the expert who actually examined him and found that he wasn't mentally retarded. So I think the defendant claims that while the defendant is able to mask his mental impairments, well, apparently he's very adept at that because the police had no qualms about it. They had no belief that he was unable to waive his Miranda rights or he didn't understand it. It was just the opposite. He actually went through and he explained to the youth officer in his own words what those rights were. The judge found that he's an astute young man that understands things, so he fooled the trial court. And more importantly, he apparently fooled these clinical psychologists who interviewed him and did the whole clinical history and social history on him. It's James Crudulity to suggest that he's mentally retarded. All the evidence completely shows just the opposite. Suddenly, that's not totally opposite to what you're arguing? It's low average, I believe. I don't want to misuse the words. But there is some evidence to suggest that he's got limited intelligence. Yes, but he has no cognitive disorder. His low intelligence in the cases we cite in our brief, Houseworth, Mahaffey, Randall. Mahaffey is a Supreme Court case. Evidence of limited intellectual capacity alone does not indicate that a defendant is incapable of waiving his constitutional rights or making an inculpatory statement. It's one factor among the totality of the circumstances. And Houseworth is very instructive because Houseworth was actually an almost identical claim where this evidence was in the record and the claim was that counsel was ineffective for bringing the evidence of his psychiatric history to the trier of fact in hopes of suppressing his statement. And this court, it's a first district case, rejected that claim. And we'd ask that based on that authority, this court reject the claim in this case. Turning to the second issue in this brief, the first issue we raised today, the rape shield claim. The function of the rape shield statute is to exclude evidence of a victim's prior sexual activity, even if relevant, even if relevant, where it has little probative value and great capacity to embarrass, humiliate, or distract. That's the Freeman case, 2010 decision from this court. The evidence that the defendant sought to introduce in this case was the quintessential evidence that the rape shield statute is designed to prevent. And the trial court recognized that. In this case, and we argue in our brief, the defendant didn't even establish relevance, first of all. That threshold, even forgetting the rape shield act and forgetting the right to present a defense, merely failed to present any indication that this was relevant. He had evidence that there was sperm in the victim's vagina, and I think it's common knowledge that that can last 72 hours. So what the defense attorney did, and I think this is a nuance, he sort of transmuted that 72-hour rule that pertains to the sperm to suggest that, well, the redness itself could last 72 hours. Therefore, I should be able to show that this redness was the product of prior consensual sexual intercourse. There were bruises. There were bruises, right. The other indicia of the attack, the fresh bruises on her thigh, and I believe on her neck, her wrists, her arms, her hip, and her thigh. The jury was only, correct me if I'm wrong, the jury was only given evidence there were bruises. And wouldn't that imply that the defendant made those bruises? Absolutely. Without a doubt. But they could have been made by her boyfriend. The bruises? No, I disagree, Your Honor. Those were fresh bruises. They were described as fresh, and that this, you know, and I don't think that consensual sex with her boyfriend three days earlier caused bruising to her neck, wrists, arms, waist, hip, and thigh. I'm just talking about it was found in her vagina. And the cervix. The only physical evidence with regard to the actual genitalia was the redness to the cervix, which the state's expert explained could have been caused by sexual intercourse, period. Not forced intercourse, not forced rape, just intercourse. The state's attorney drew the inference that that redness was caused by the defendant, correct? That was mentioned in the closing argument. So it's just totally unreasonable that the defendant wants to make the argument that maybe that redness was caused by the boyfriend. Absolutely not, Your Honor. In fact, the defendant actually capitalized on this in his argument. He said it's meaningless and it can be caused by prior consensual sex. The defendant got to make the very point that he's claiming that he was prevented from. But he didn't get to introduce evidence that the woman complainant had recently had sex with her boyfriend. And consistent. Did he? Is that correct? No. And consistent with the rape shield act. That evidence was excluded. Consistent with the rape shield act. He was not allowed to ask this victim herself, did you have sex with your boyfriend within 72 hours and did he ejaculate? That is evidence that the rape shield is designed to prevent. Was there evidence that said that 72 hours of bruises shouldn't have been around anymore? The redness you mean? His claim. You said she had sex with her boyfriend 72 hours before. That was during the sidebar. The State sort of in a proffer that that's what the victim would say. Okay. And is there, you told me that there should not have been bruises from the consensual sex. I'm saying that there's no, the defendant made no offer of proof and made no claim that consensual sex with her boyfriend would cause redness or cervical inflammation. There was no evidence of that. Redness to the cervix. Not to do with the bruising, which clearly was evidence of a recent sexual attack. In this case, the defendant, he never made that, and he could have. He could have asked the State's expert. He could have said, well, hypothetically, he's an expert. He can testify to hypotheticals. He can testify to his understanding and knowledge of treating and examining sexual assault victims. In your experience, does redness to the cervix last longer than 72 hours? He didn't ask that. That wouldn't have been, arguably, would not have been precluded by the Rape Shield Act, because he's not asking about this particular victim's sexual history, which is what the act, again, without repeating myself, is designed to prevent. Specific acts of sexual conduct with persons other than the defendant have no bearing on whether she consented to sex with the defendant. It's axiomatic. That's the Freeman decision, again, 2010. The cases that the defendant relies on to sort of suggest that physical evidence is indicating or arguably relevant to suggest an alternate explanation for a sexual attack, every case, the case that said that was Sandoval, and in that case, it decided the Michigan, I think it was a Michigan Supreme Court case that stated that. Since Sandoval, that rule regarding physical evidence, usually it's in a child victim's vagina, is applied to child victim cases. Anthony Roy, Jr., Mason, even Freeman itself, 12 years old, 12 years old, 7 years old, those cases speak to the presumed sexual innocence of children. So when there's a rape case involving a 7-year-old and she has a torn hymen, that is the biggest red flag imaginable. That does not translate to a 25-year-old woman where the probative value is so far diminished. And that's the whole point of the Rape Shield Act. If it's so diminished, why does the state draw an interest in that rape? There's a distinction between the rape shield, the presumption is that evidence of this nature is barred. Operating from that presumption, it has to be not merely relevant. The cases say it has to be more than merely relevant. It has to be constitutionally required. That is a much different standard than merely relevant. Mere relevance, as this Court is aware, is a very low standard, but it's not constitutionally required in that the state or the defense was able to argue these inferences. That's sort of a different inquiry. And the defendant, without objection, was allowed to make that argument. He doesn't have a right to ask the victim this information, to elicit testimony either from her or statements that she made to another person regarding her past sexual history. The defendant could have asked the expert myriad questions about evidence of sexual, forced sexual intercourse. What else do you find? What else do you typically see after consensual sex? Do you see this? Do you see that? How long does the redness last? He didn't ask any of that. He wanted to specifically ask questions about this victim's sexual history. And whether that was a strategic mistake is maybe a different issue. But he didn't ask questions that he probably could have asked from the expert about the redness. He asked for a sidebar, and he wanted to go full bore into, well, now I've got an excuse to bring out this victim's sexual, the fact that she's having sex with her boyfriend. And the implications are clear. To tell a jury, here's a young woman who's having sex with her boyfriend. She's having extramarital sex. Those are big reasons why the Rape Shield Act has been in existence for, I believe at least in Illinois, for over 30 years. It's to prevent that type of questioning. The Santos case, it's an Illinois Supreme Court case. It's very similar to this case, and it speaks to sort of what the defendant was trying to do, aside from establish her sexual history or discuss it or imply that it was relevant. You cannot use this evidence to discredit a victim and suggest that she's lying. And that's exactly what he was trying to do in this case, suggesting that her testimony that he vaginally raped her was not true, that she was lying. And he was trying to use this evidence that she had redness in her cervix, that she had consensual sex, as proof that she's lying, to discredit her, to impeach her. And Santos was very clear, you cannot do that to impeach. So for all those reasons, on those particular issues, we'd ask that this court affirm the defendant's convictions and his sentences. And just one more point. Going back to the youth officer. I'm kind of stuck on that, so help me out. Okay. The youth officer, in his role as a concerned adult, to look out for some interests of the defendant Patterson. Should that youth officer also, at the same time he's doing that, be actively compiling evidence against the juvenile? Is there any case out there that would help me out on this? Well, there's cases that, so the claim has been raised in the past, is the youth officer's participation in the investigation or his prior involvement in the investigation, does that bar him from playing the role of youth officer? And this court has said no, that he can have participation. Because the role of youth officer is not, and there is a distinction between youth officer and concerned adult. They're not the same thing. So a concerned adult is what the youth officer is supposed to do, make reasonable efforts to procure their presence, to make phone calls, to leave messages, to do what they think is necessary. But it's just reasonable. They don't have to delay the investigation or thwart an otherwise perfectly legitimate police investigation just because they're not able to reach somebody. But so their role then as youth officer, it's sort of, I think the language the cases use is it offsets the absence of a concerned adult. So they are not a concerned adult to the extent that they're supposed to be there saying, you know, Ronald, I really don't think you ought to talk to these officers. You know, it's not in your best interest. Why don't we go outside and talk before you, you know, you make these statements. That's the role of attorney. And that's maybe the role of a concerned adult, the mother, the grandfather, the grandmother would say, don't talk to them, and then that's up to him. But the youth officer doesn't, the case law is very clear, GEO says this, and Haney. Haney describes the role of youth officer. Notify the parents, ensure Moran is given, ensure the defendant is not coerced. It's a very simple, it's a limited role. They're not there to prevent lawful, valid questioning. Does that answer your question, Your Honor? Yes, it does. Okay. So for those reasons, we'd ask that this court affirm the defendant's convictions in his consecutive sentences. Okay. Thank you. Counsel? Your Honors, I'd like to pick up on the youth officer issue. Again, counsel just cited the Haney case, and that's sort of the example of what a youth officer should do. Because in that case, the youth officer made repeated phone calls over the course of a period of time to try to find a concerned adult and was able to delay the questioning until the concerned adult came to the station. And so that's what we're asking for here. We're not asking for a lot. We're not asking for the youth officer to do things, you know, to give advice to the juvenile or anything like that. We're asking for sort of the bare minimum that he try to find a concerned adult. And that's where Detective Kaminsky failed in this regard. Justice Steele also asked about a case where a youth officer actively compiled evidence against the juvenile. Griffin is a good case for that. And that's a case where the confession was suppressed because the youth officer couldn't fulfill both duties. As far as Stephen Kehoe giving permission to speak to the juvenile, you know, that's not really worth a whole lot where the police were already arresting Ronald, and Kehoe had to be concerned himself about the fact that one of his employees had just been sexually assaulted and had his own legal liabilities to be concerned with. The police are coming to arrest Ronald. Sure, you can talk to Ronald. You're arresting him anyway. So, you know, for what that's worth, it's not a whole lot. But also it's interesting to note that Kaminsky, even after he purports to have the permission from Kehoe, still gives a call to Ronald's caseworker. You know, if he thought that Kehoe's permission was enough, why even bother calling the caseworker to try to, you know, get any sort of permission or find a concerned adult? And as for the DCFS hotline, the state argues that that's reserved for allegations of abuse. But Kehoe himself, during his testimony, recommended that the officer could have called the DCFS hotline after hours. As to the mental retardation, I would just like to point out that the line of an IQ of 70 doesn't exist just with regard to the capital punishment statute. The line of 70 also exists in all the literature cited in the briefs. You know, that's where they draw the line for mental retardation as a general matter. And then as for the rape shield issue, I'd just like to say that the black letter law is very clear, where there's evidence of, you know, some physical evidence that the defense wants to explain, such as physical indications of intercourse. That's where the defendant's entitled constitutionally to confront. So this isn't something where he's just trying to get forth impeachment evidence. He's trying to confront physical evidence. And the fact that he can make arguments and sort of suggest inferences is no substitute for being able to present evidence to support those arguments. And if this Court has no other questions, then we would just ask that you reverse and remand for your trial. Thank you. Thank you very much. Let me thank both counsels and state for the record that your briefs and your all arguments were simply excellent. I enjoyed reading it. This is going to be a very interesting matter. My colleagues and I will take it under advisement, and we'll get back to you shortly. Thank you very much.